1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**

9

**TERRITORY OF GUAM**

10

UNITED STATES OF AMERICA for
the use and benefit of PORGES
ELECTRICAL GROUP, INC.,

11

Case No.:   CV 15-00024

12

Plaintiff,

**ORDER RE: DEFENDANTS'
MOTION FOR JUDGMENT AS A
MATTER OF LAW [DKT. NO. 263]
AND DEFENDANTS' MOTION
FOR A NEW TRIAL [DKT. NO.
264]**

13

v.

14

TRAVELERS CASUALTY AND
SURETY COMPANY OF AMERICA
and PATRICIA I. ROMERO, INC.,
doing business as PACIFIC WEST
BUILDERS,

15

16

17

Defendants.

18

19

The matters before the Court are (1) Defendants' Renewed Motion for

20

Judgment as a Matter of Law ("Renewed JMOL") (Dkt. No. 263); and (2)

21

Defendants' Motion for a New Trial.

22

**I.      BACKGROUND**

23

Pacific West Builders ("PWB") entered into two prime contracts with the

24

Government, one to construct a Working Dog facility at the Apra Harbor Naval

25

Base in Guam ("Military Working Dog Project" or "MWD Project") and one to

26

construct the Red Horse Cantonment Operation Facility at Anderson Air Force

27

Base ("Red Horse Project"). PWB subsequently entered into a written subcontract

28

with Porges Electrical Group, Inc. ("Porges" or "PEG") with respect to certain

1

electrical work to be performed on the two projects. The projects experienced various delays. PEG contends it was required to do extra work beyond the scope of the contract and PWB failed to pay the balance due under the subcontracts. PEG brought suit against PWB asserting claims for breach of contract, reasonable value/quantum meruit, and recovery under the Miller Act. PWB contends it suffered damages as a result of PEG's failure to fulfill all of its contractual obligations, and asserts backcharges against PEG as a result. The jury found in favor of PEG on all of its claims, but also found for PWB on its claim for backcharges. Following trial, PWB brought the instant Motion for Judgment as a Matter of Law and Motion for a New Trial.

## II.     STATEMENT OF THE LAW

### A.     Motion for Judgment as a Matter of Law

A party may file a motion for judgment as a matter of law any time before the case is submitted to the jury. Fed. R. Civ. P. 50(a)(2). "If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may . . . grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 50(a)(1). However, if a district court does not grant a Rule 50(a) motion, "the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b). When a motion for judgment as a matter of law is renewed after a verdict was returned, "the court may . . . (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial, or (3) direct the entry of judgment as a matter of law." Fed. R. Civ. P. 50(b).

"A jury's verdict must be upheld if it is supported by substantial evidence." *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007). In making this

determination, the Court may not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000). Although the Court reviews the record as a whole, it "disregard[s] all evidence favorable to the moving party that the jury is not required to believe." *Id.* The remaining evidence "must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party." *Wallace*, 479 F.3d at 624. Under this exacting standard, judgment as a matter of law is inappropriate unless "the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Id.* "That is, a motion for judgment as a matter of law is properly granted only if no reasonable juror could find in the non-moving party's favor." *Mangum v. Action Collection Serv., Inc.*, 575 F.3d 935, 939 (9th Cir. 2009) (quotations, alteration marks omitted).

**B.      Motion for a New Trial**

Federal Rule of Civil Procedure 59 provides that "[t]he court may, on motion, grant a new trial on all or some of the issues--and to any party-- . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1). Rule 59 further provides that "the court, on its own, may order a new trial for any reason that would justify granting one on a party's motion. After giving the parties notice and an opportunity to be heard, the court may grant a timely motion for a new trial for a reason not stated in the motion. In either event, the court must specify the reasons in its order." Fed. R. Civ. P. 59(d). Therefore, under Rule 59 "[t]he district court . . . is not limited to the grounds a party asserts to justify a new trial, but may sua sponte raise its own concerns," and the court "can grant a new trial under Rule 59 on any ground necessary to prevent a miscarriage of justice." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 842 (9th Cir. 2014). "Unlike with a Rule 50 determination, the district court, in considering a Rule 59 motion for new trial, is not required to view the trial evidence in the light most favorable

3

to the verdict. Instead, the district court can weigh the evidence and assess the credibility of the witnesses." *Id.* (citation omitted).

The district court may grant a new trial where the jury's verdict is against the "clear weight of the evidence." *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1083 (9th Cir. 2009). "When the court, after viewing the evidence concerning damages in a light most favorable to the prevailing party, determines that the damages award is excessive, . . . [i]t may grant defendant's motion for a new trial or deny the motion conditional upon the prevailing party accepting a remittitur." *Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 603 (9th Cir. 1983). The district court's grant of a new trial under Rule 59 is reviewed for an abuse of discretion, meaning a district court's decision to grant a new trial will be overturned "only when the district court reaches a result that is illogical, implausible, or without support in the inferences that may be drawn from the record." *Experience Hendrix L.L.C.,* 762 F.3d at 842. "The district court's denial of a motion for a new trial" under Rule 59 "is reversible only if the record contains no evidence in support of the verdict or if the district court made a mistake of law." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 962 (9th Cir. 2009) (internal quotations omitted).

## III.     RULES OF DECISION

PEG's claims under the Miller Act are governed by federal law. All other claims in this action are governed by state law. No party has asked the Court to apply any state law other than Guam. "As the Guam Code provisions relating to contracts were adopted from the California Civil Code, the court also draws from California contract law" as necessary. *Yang v. Majestic Blue Fisheries, LLC*, 2015 WL 5003606, at *5 (D. Guam Aug. 24, 2015), *aff'd*, 876 F.3d 996 (9th Cir. 2017).

/ / /

/ / /

/ / /

4

# IV.   DISCUSSION

## A.   Motion for Judgment as a Matter of Law

### 1.   Waiver

PEG argues PWB waived many of the arguments advanced in its renewed JMOL motion by failing to raise them in its pre-verdict motion for judgment as a matter of law. PWB responds that every argument advanced in its renewed motion is encompassed within the general grounds asserted for the original motion: "that there is not sufficient evidence offered or that as a matter of law there cannot be a judgment entered in favor of the Plaintiff."

With respect to any particular issue, judgment as a matter of law is only appropriate "on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 50(a)(1)(B). Many of the issues raised in PWB's renewed motion for judgment as a matter of law, even if resolved in PWB's favor, would not result in a judgment against PEG on any particular claim or defense, but would merely affect the measure of damages. Accordingly, the Court will consider all such issues under PWB's motion for a new trial rather than under its motion for judgment as a matter of law, thus rendering moot any issues regarding whether they were sufficiently raised in PWB's Rule 50(a) motion. *See Nassar v. Jackson*, 779 F.3d 547, 552 (8th Cir. 2015) ("As the school district and Jackson seek either a new trial on the issue or to amend the judgment, a Rule 59 motion is the appropriate vehicle.") (quotations omitted).[1] The only issue challenged by PEG as waived that could potentially result in a judgment against PEG is PWB's argument "that Porges is barred from claiming delay damages because the subcontracts gave PWB unfettered discretion to schedule and sequence work." However, as discussed below, this argument fails on the merits, thus rendering moot any

---

[1] *Cf. Am. Bank of St. Paul v. TD Bank, N.A.*, 713 F.3d 455, 468 (8th Cir. 2013).

5

dispute over whether it was sufficiently preserved.

## 2. Breach of Contract

### a) Unpaid Contract Balance

PWB does not challenge the sufficiency of the evidence to support PEG's claim for the unpaid portion of Subcontract balance, so this claim is not at issue in PWB's motions.

### b) Delay Damages

PWB does not dispute the basic premise that "[d]elay damages are a common element recoverable by a party aggrieved by the breach of a construction contract,"[2] but contends the evidence at trial was insufficient to sustain an award of delay damages as discussed below.

### (1) Contractual Control Over the Schedule

PWB argues PEG's claims for delay damages fail as a matter of law because the MWD Subcontract provided PWB would control the timing and sequence of work on the Project. PWB appears to contend that the contractual provision granting PWB control over the work schedule renders inapplicable the usual rule imposing liability on the general contractor for delays in the progress of a subcontractor's work.

"Ordinarily, as between a subcontractor and the contractor who is in control of the work being performed, the law places the latter under an obligation to make good all losses consequent on delays in the progress of the work not attributable to the subcontractor." *Frank T. Hickey, Inc. v. Los Angeles Jewish Cmty. Council*, 128 Cal. App. 2d 676, 685 (1954), *cited with approval in MElectric Corp. v. Phil-Gets (Guam) Int'l Trading Corp.*, 2012 Guam 23 ¶ 34. "However, this rule may be made inapplicable by the express provisions of the subcontract." *Id.* at 685.

Here, the MWD Subcontract provides:

---

[2] *See JMR Constr. Corp. v. Envtl. Assessment & Remediation Mgmt., Inc.*, 243 Cal. App. 4th 571, 585 (2015), *as modified on denial of reh'g* (Jan. 28, 2016).

6

> Time - The parties agree that time is the essence of this Subcontract and that it shall be the Subcontractor's obligation to begin the work herein contracted for as soon as the project upon which the work is to be done is ready for such work or, in any event, within two (2) calendar days after being notified in writing by the Contractor to do so, to complete all work according to the schedule of the Contractor, and to coordinate this work with that of all other contractors, subcontractor[s], and the Contractor in a manner that will facilitate the efficient completion of the entire project. *The Contractor shall have complete control over the sequence in which the various portions o[f] the work shall be done and update the schedule as his judgment may dictate. The Subcontractor will adjust his/her work accordingly.*… (Ex. 31.15 ¶ 2 (emphasis added).)

There is nothing in the contractual language displacing the usual rule of liability for delays recognized in *Hickey*. While the contractual language gives PWB discretionary control over the schedule, such control is not inconsistent with liability for delays and does not contradict the implied covenant to provide PEG with the necessary access and preconditions to timely perform its work. *See Hickey*, 128 Cal. App. 2d at 685 (recognizing the obligation of "the contractor *who is in control of the work being performed*" to compensate subcontractors for losses due to delays in the schedule) (emphasis added).[3]

### (2) Measure of Delay

PWB argues PEG's calculation of delay damages is based on a legally incorrect view of the period against which delay is to be measured. Specifically, PWB contends the MWD Subcontract incorporated provisions of the MWD Prime Contract and the MWD Request for Proposal, which specifically dictated the time for performance under the contract. Thus, PWB argues, only time extending beyond the periods specified in the Prime Contract (731 days) or the Request for Proposal (570 days) constitutes "delay" for purposes of damages. However, the

---

[3] *Cf. Carma Developers (Cal.), Inc. v. Marathon Dev. California, Inc.*, 2 Cal. 4th 342, 372 (1992) ("The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith.")

7

cited provisions in the Prime Contract and the Request for Proposal do not relate to the work to be performed by PEG but to the overall project completion deadlines for PWB.[4] Neither the Prime Contract nor the Request for Proposal purports to dictate the amount of time that PEG was required to be on site during the project.

PWB also misconstrues PEG's delay calculation in characterizing it as "based on Porges' unexpressed subjective intent about how long PEG would be on each project." PEG's cause of action for breach of contract relied, at least in part, on breach of the implied covenant to provide PEG with the access and preconditions necessary to reasonably and timely perform its contracted work.[5] The damages awarded for a breach of this implied covenant "seek to approximate the agreed-upon performance. The goal is to put the plaintiff in as good a position as he or she would have occupied if the defendant had not breached the contract. In other words, the plaintiff is entitled to damages that are equivalent to the benefit of the plaintiff's contractual bargain." *Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 34 Cal. 4th 960, 967-68 (2004) (quotations, citations omitted). Therefore, in assessing damages for breach of this covenant, the relevant baseline is the position PEG would be in if PWB had provided PEG with the access and preconditions necessary to reasonably and timely perform its contracted work. The number of delay days is merely a means of estimating the amount of money

---

[4] *See, e.g.*, T9 122:11-18 (noting that "the dates or days allocated for the project in the prime contract" relate to "the time for performance for the *general contractor*") (emphasis added); T2 65:13-14 ("[T]he RFP will have calendar days. It'll show you the days for—it's all inclusive, days for design and construction.").

[5] *See* T10 52:14-19 ("Porges claims that PWB breached the subcontract by failing to make the work available to Porges within a reasonable timeframe and failing to coordinate Porges' work with the other activity on the projects."). *Accord* 18 Guam Code § 87121 ("Stipulations which are necessary to make a contract reasonable or conformable to usage, are implied, in respect to matters concerning which the contract manifests [no] contrary intention."); Judicial Council of California Civil Jury Instruction ("CACI") 4502; *Tonkin Constr. Co. v. Cty. of Humboldt*, 188 Cal. App. 3d 828, 832 (1987).

required to put PEG in that position.[6]

Similarly, David Porges's expectations regarding the time PEG would be on site are relevant because they reflect his estimate as an experienced electrical subcontractor of how long PEG's performance would have lasted if PWB had not breached this implied covenant. This estimate of around six months[7] was corroborated by PWB's planned schedule which estimated PEG's performance would last 168 days,[8] and the opinion testimony of PEG's expert witness found both estimates to be reasonable.[9] Accordingly, there is sufficient evidence to support a finding that PEG's performance would have lasted only 168 days if PWB had provided PEG with the access and preconditions necessary to complete its work in a reasonable and timely manner. Because the damages awarded for breach of this implied covenant "seek to approximate the agreed-upon performance," *Lewis Jorge Constr. Mgmt.*, 34 Cal. 4th at 967, and there is evidence to support a finding that PEG could have completed its work in 168 days had PWB fully performed, 168 days was not an inappropriate baseline from which to calculate PEG's delay damages.

### (3)     Failure to Perform Critical Path Analysis

PWB also argues PEG's failure to perform a critical-path analysis is fatal to its claims for delay damages. Although the critical path analysis is a central aspect of litigation between general contractors and the federal government,[10] the current dispute is governed by Guam law. *Compare United States v. Allegheny Cty., Pa.*,

---

[6] Contrary to PWB's contention, PEG is not claiming that it "suffered 984 total compensable delay days." It is claiming that it suffered independent financial injuries from PWB's breaches of two different subcontracts, and the respective number of days by which its performance was delayed on each subcontract is relevant in estimating the extent of its injuries from each breach.

[7] *See* T2 67:3-22.

[8] *See* Puzzullo Tr. 257:16-24.

[9] *Id*. at 238:12-24.

[10] *See Commercial Contractors, Inc. v. United States*, 29 Fed. Cl. 654, 661 (1993).

9

322 U.S. 174, 183 (1944), *abrogated on other grounds by United States v. City of Detroit*, 355 U.S. 466 (1958) ("The validity and construction of contracts through which the United States is exercising its constitutional functions, their consequences on the rights and obligations of the parties, the titles or liens which they create or permit, all present questions of federal law not controlled by the law of any state.") *with Howard Contracting, Inc. v. G.A. MacDonald Constr. Co.*, 71 Cal. App. 4th 38, 52 (1998), *as modified* (Jan. 20, 1999) (noting *Mega Construction Co., Inc. v. United States*, 29 Fed. Cl. 396 (1993) "held that a contractor's entitlement to delay damages requires the presentation of evidence that establishes the critical path of a project and the occurrence of delays along the path," but concluding the *Mega Construction* case "does not stand for the proposition that use of a critical path method schedule is required to establish the occurrence of compensable project delays," and "[e]ven if the case did stand for such a proposition, federal decisional authority is neither binding nor controlling in matters involving state law."). Under the law of Guam, in order to recover from PWB for its breach of contract claim, PEG must prove "three elements: (1) a valid contract; (2) a material breach; and (3) damages resulting from the breach." *Gov't of Guam v. Kim*, 2015 Guam 15 ¶ 60. PWB has not identified any element of PEG's claim for which a critical path analysis would be essential, and therefore the failure to provide a critical path analysis cannot be fatal to PEG's claim.[11]

### (4) Failure to Prove Responsibility for All Delays

PWB argues the total time for which PEG seeks delay damages includes periods where the delays were not caused by PWB. PEG does not dispute its delay damages calculation includes delays caused by other subcontractors and by the government, but argues including these delays that were not caused by PWB is

---

[11] *See also* Dkt. No. 168 at 2 n.1.

appropriate under the governing law.[12]

Under federal law, a contractor seeking delay damages from the Government is limited to delays caused by the Government. *See, e.g.*, *Youngdale & Sons Const. Co. v. United States*, 27 Fed. Cl. 516, 550 (1993). PWB seeks extension of this principle to govern the liability of a general contractor to one of its subcontractors, an issue governed by Guam law. There is no authoritative Guam case law speaking directly to this issue. However, under California law, the liability of a general contractor to its subcontractors is not limited to delays caused by the general contractor. *See, e.g.*, *Hickey*, 128 Cal. App. 2d at 685 ("Ordinarily, as between a subcontractor and the contractor who is in control of the work being performed, the law places the latter under an obligation to make good all losses consequent on delays in the progress of the work not attributable to the subcontractor.").[13] Accordingly, the Court follows California law and holds in the absence of an express provision in the Subcontract to the contrary, PWB is liable for "delays in the progress of the work not attributable to the subcontractor." *Hickey*, 128 Cal. App. 2d at 685.

### (5)     Field Office Overhead

PWB does not dispute that, assuming it is liable for delay, PEG can recover "[o]verhead that [it] otherwise would not have incurred but for the delay." CACI 4543; *accord JMR Constr. Corp*, 243 Cal. App. 4th at 586. However, PEG argues there is no sufficient basis on which PEG's field office overhead damages can be calculated with reasonable certainty, thus mandating judgment in favor of

---

[12] PEG does not argue the evidence was sufficient to sustain the jury's award if PWB is only liable for its own delays.

[13] *Accord In re Groggel*, 333 B.R. 261, 284 n.5 (Bankr. W.D. Pa. 2005) ("Horsley contends that California law provides that a primary contractor can be liable to its subcontractor for delay damages caused by other of such primary contractor's subcontractors only if such primary contractor engaged in active interference or was actively at fault. The Court disagrees with Horsley on such point and finds instead that California law does not require for such liability to exist that a primary contractor actively interfere or be actively at fault.").

PWB on this claim.

At trial, PEG introduced its job cost reports to show the expenses it incurred on the MWD Project.[14] PWB, however, argues there is no evidence that PEG's job cost reports are an accurate reflection of its expenses because PEG did not provide receipts or supporting documentation to corroborate the reports at trial. The lack of additional supporting documentation goes to the weight to be given to the job cost reports. The jury heard testimony that the financial records from which these job cost reports were generated were kept by PEG in the ordinary course of its business, that PEG relied on the records for its budgeting, and that David Porges reviewed those records on a monthly basis to make sure they were accurate;[15] testimony regarding the storage of those records and the process for generating reports therefrom;[16] and testimony that, to the best of David Porges's knowledge after having reviewed the reports, the reports accurately reflect the data that had been inputted during the course of the Projects.[17] Such testimony was a sufficient basis for the jury to credit the job cost reports as an accurate reflection of PEG's expenses.

PEG also submitted evidence at trial regarding when delays occurred on the MWD Project.[18] The parties agree the best method of estimating PEG's field overhead damages is by multiplying a daily field overhead rate (which is determined by dividing the total field overhead incurred by PEG by the total number of days spent performing under the contract) by the number of delay days. However, PWB challenges PEG's estimation of the number of delay days (as

---

[14] *See* Exs. 278, 288. PEG also offered expert opinion testimony as to the amount of PEG's field office overhead, though it later largely disclaimed that opinion, contending during closing arguments that the amount was wrong.

[15] T2 32:11-34:16; 129:15-130:17.

[16] T2 130:23-132:7.

[17] *See, e.g. id*. at 132:16-133:19.

[18] *See, e.g.*, Puzzullo Tr. 262:1-8; 264:18-65:9; 269:20-70:1; 275:23-76:4.

12

discussed above) and PEG's estimation of its daily field overhead rate. PWB argues there is no evidence which job cost entries were used in calculating PEG's purported total field overhead costs, and thus no evidence that those entries meet the legal standard for compensable field overhead costs. At no point during the 10-day trial did PEG go through each line-item in the 78-page job cost report,[19] and indicate whether that item had been included or excluded from PEG's calculation. However, the job cost report itself was entered into evidence and the jury was instructed as to the parties' stipulated meaning of "field office overhead"[20] and instructed to determine how much weight to be given in judging credibility, thus allowing the jury to—at its discretion—either (1) rely on the job cost report to total up the particular line items that it considered to fall within the definition of "field office overhead" and make its own calculation, (2) decide that David Porges was not credible and deny field office overhead damages altogether on the basis that the jury was not obligated to do PEG's work for it, or (3) rely on David Porges's testimony to support the accuracy of PEG's determination of which costs constituted field overhead costs. Therefore, there was substantial evidence offered at trial to support the first of these three alternatives.

PWB also argues PEG's method of calculating its field office overhead violates Federal Acquisition Regulations. Specifically, PWB notes "throughout both projects, PEG treated its FOOH on a percentage basis and issued [requests for] change orders or time and material tickets with a 5% field office markup to account for its indirect costs." PWB contends attempting to now itemize its field overhead costs, rather than using a straight 5% markup, violates 48 C.F.R. § 31.105(d)(3), which provides that "[c]osts incurred at the job site incident to performing the work, such as the cost for superintendence, timekeeping and clerical work, engineering, utility costs, supplies, material handling, restoration

---

[19] *See* Ex. 278.
[20] *See* Jury Instruction No. 14.3.1.

and cleanup, etc., are allowable as direct or indirect costs, provided the accounting practice used is in accordance with the contractor's established and consistently followed cost accounting practice for all work." In the absence of authoritative Guam law on the subject, the Court looks to what California law regarding the measure of damages. Under California law, "[t]here may be more than one rule for the measurement of damages in the same action. [¶] In such case that one will be preferred which affords the better and more satisfactory means of reaching an accurate and certain result." *A. A. Baxter Corp. v. Colt Indus., Inc.*, 10 Cal. App. 3d 144, 160 (Cal. Ct. App. 1970) (citations omitted). Because a calculation based on actual field overhead costs is a "more satisfactory means of reaching an accurate and certain result" than an across-the-board 5% markup, California law appears to support PEG's measure of damages. Accordingly, PWB's argument fails because PWB does not demonstrate that the Federal Acquisition Regulations on which it relies preempts the application of state law in determining the measure of damages between two private parties.

PWB also argues the field overhead amount requested by PEG (which the jury ultimately awarded) includes one-time costs that do not qualify as "field overhead," since they do not increase over time. However, the fact that PEG requested—and the jury may have awarded—damages for certain one-time cost items that do not technically qualify as "field overhead" is not *per se* problematic. The jury could reasonably conclude, for example, that the costs incurred by PEG for flying James Armstrong to Guam were proximately caused by PWB's ordering PEG to mobilize and then failing to provide it with the access and preconditions necessary to commence work.

PWB also speculates the damages awarded by the jury may have included costs PEG would have incurred irrespective of delays on the MWD Project, such as the one-time cost of shipping materials to Guam for the project. However, in order to justify overturning the jury's damages award, PWB must demonstrate the

14

evidence is insufficient to support the jury's damages award under any permissible calculation. PWB has not demonstrated the amount awarded by the jury could only be reached by including costs not proximately caused by PWB's breach of contract.

PWB further argues the field overhead damages requested by PEG on the Red Horse Subcontract includes costs for which PEG has already been compensated by PWB.[21] For example, on the Red Horse project, PEG sought delay damages for the period from August 28, 2013 to November 14, 2013.[22] However, as PWB notes, PEG submitted a Time & Materials Invoice for work done during that time period, which PWB paid, and that invoice included reimbursement for field overhead costs.[23] PEG does not proffer any alternative method of reaching the amount awarded based on the evidence in the record. Although concerns about double-recovery would not justify entering judgment as a matter of law in PWB's favor, it supports an order for a new trial on damages. *See Experience Hendrix*, 762 F.3d at 847-48 (considering, among other factors, the potentially duplicative nature of a damages award, and affirming the trial court's order granting a new trial on damages). Accordingly, the Court grants the motion for a new trial on the issue of damages.

### (6) Home Office Overhead

PWB contends there is insufficient evidence to support a finding it is liable for home office overhead damages.

"Where performance of a contract has been delayed, the overhead expenses of performing that contract continue for the additional time." *West v. All State*

---

[21] In challenging the sufficiency of the evidence to support an award for field office overhead damages on the Red Horse Subcontract, PWB makes many of the same arguments as it does in challenging the sufficiency of the evidence with respect to the MWD Subcontract which were discussed above. These arguments fail for the same reasons.

[22] *See* Puzzullo Tr. 303:2-8.

[23] *See* Ex. NI.

15

*Boiler, Inc.*, 146 F.3d 1368, 1378 (Fed. Cir. 1998) (quoting *Capital Elec. Co. v. United States*, 729 F.2d 743, 748 (Fed. Cir. 1984) (Friedman, J., concurring)). "These additional indirect costs may thus be 'unabsorbed,'" and the Court of Claims has "consistently allowed a contractor to recover not only additional direct costs that accrue to a contract where completion of performance is delayed by the government, but also any *unabsorbed,* indirect costs that result." *Id.* at 1372 (citations, quotations omitted). The parties agree the "*Eichleay* Formula" is a permissible means of estimating a party's unabsorbed home office overhead costs.[24] *JMR Constr. Corp.*, 243 Cal. App. 4th at 587. The *Eichleay* Formula estimates the unabsorbed home office overhead allocable to delays on a particular project by looking to the proportion of revenue from the project to total revenue during the period of performance on the project. The recoverable home office overhead is thus calculated as follows:

$$\frac{Contract\ Billings}{Total\ Billings\ for\ Contract\ Period} \times \frac{Total\ Overhead}{for\ Contract\ Period} = \frac{Overhead\ Allocable}{to\ the\ Contract}$$

$$\frac{Allocable\ Overhead}{Days\ of\ Performance} = Daily\ Contract\ Overhead$$

$$Daily\ Contract\ Overhead \times Delay\ Days = Amount\ Recoverable$$

Federal courts have identified three prerequisites for recovery of unabsorbed home office overhead from the Government. "Entitlement to *Eichleay* damages turns on whether the contractor can establish: (1) a government-caused delay; (2) that it was on 'standby'; and (3) that it was unable to take on other work." *Altmayer v. Johnson*, 79 F.3d 1129, 1133 (Fed. Cir. 1996). It is not clear to what extent these requirements must be met by a plaintiff who seeks recovery from a

---

[24] Under California law, the *Eichleay* Formula is only one permissible means of estimating damages, not the sole means. *See JMR Constr. Corp.*, 243 Cal. App. 4th at 587.

16

private party under state law, rather than from the Government under federal law. To the extent California law "places the [general contractor] under an obligation to make good all losses consequent on delays in the progress of the work not attributable to the subcontractor," *Hickey*, 128 Cal. App. 2d at 685, it would make little sense to require a subcontractor to meet the same requirements before utilizing the *Eichleay* Formula to estimate the losses it suffered as a result of the otherwise-compensable delay.[25]

### (a)  Liability for Home Office Overhead

Notwithstanding the above, PWB contends there is insufficient evidence to support a finding the requirements for application of the *Eichleay* Formula are met. First, PWB argues there is insufficient evidence to find PEG was on standby during the periods of delay because its workers continually had work to perform and PEG consistently billed work during those periods. "The proper standby test focuses on the delay or suspension of contract performance for an uncertain duration, during which a contractor is required to remain ready to perform." *Interstate Gen. Gov't Contractors, Inc. v. West*, 12 F.3d 1053, 1058 (Fed. Cir. 1993). Here, the evidence  supports a finding that, although PEG's workers were able to find some work to do during periods of delay, the work was not substantial and did not progress the projects forward significantly. Moreover, the fact that PEG was required to be ready to perform at any time prevented it from shifting its resources to reallocate indirect expenses, which is sufficient to meet the standby

---

[25] Of the two California cases discussing the use of the *Eichleay* Formula, one case explicitly rejected the notion that requirements imposed by federal law must be imported into corresponding doctrines under state law. *See Howard Contracting, Inc. v. G.A. MacDonald Constr. Co.*, 71 Cal. App. 4th 38, 52 (1998), *as modified* (Jan. 20, 1999) ("*Mega Construction* does not stand for the proposition that use of a critical path method schedule is required to establish the occurrence of compensable project delays. Even if the case did stand for such a proposition, federal decisional authority is neither binding nor controlling in matters involving state law."). The other case found the requirements imposed by federal courts were met without discussing whether the failure to meet those elements would prevent use of the *Eichleay* Formula. *See JMR Constr. Corp.*, 243 Cal. App. 4th at 588.

17

requirement. *Cf. West v. All State Boiler, Inc.*, 146 F.3d at 1380 ("While its resources are standing by, the contractor can neither reallocate those resources to accelerate another contract nor can it know when those resources will be available to begin work on the next contract."); *id.* ("This ability to shift resources translates as well into an ability to reallocate indirect expenses such that no overhead costs go unabsorbed.").

PWB also contends there is insufficient evidence PEG was unable to take on other work. However, upon introducing evidence that it was on standby for an uncertain duration, PEG made a prima facie case of its entitlement to *Eichleay* Formula damages, and the burden of production shifted to Defendants to introduce evidence "to demonstrate that it was not impractical for the contractor to take on replacement work." *Id.*[26]

PWB further argues PEG's inability to take on other work is defeated by the fact PEG had nine other projects ongoing during the delays on the MWD Project. PWB, however, appears to misunderstand the law regarding the *Eichleay* Formula, and conflates "other" work with "replacement" work. *Id.* at 1377 ("The critical factor, then, is not whether the contractor was able to obtain or to continue work on other or additional projects but rather its ability to obtain a *replacement* contract to absorb the indirect costs that would otherwise be unabsorbed solely as a result of a government suspension on one contract.") (emphasis in original). None of the nine other projects identified by PWB constitute "replacement" work for the MWD Project, and therefore have no effect on PEG's ability to recover *Eichleay* Formula damages.

---

[26] PEG was not required to produce evidence that it would be impractical to take on other work. *See Mech-Con Corp. v. West*, 61 F.3d 883, 886 (Fed. Cir. 1995) ("[W]hen a contractor can show that the government required a contractor to remain on 'standby' and the government-imposed delay was 'uncertain,' the contractor has established a *prima facie* case of entitlement to Eichleay formula damages.").

18

1           **(b)**       **Amount of Damages**

2       In challenging the amount of home office overhead damages awarded by the

3 jury, PWB reiterates its argument that only delays in excess of the entire project's

4 duration can be considered in calculating PEG's recovery for home office

5 overhead. As discussed above, this argument fails because the purpose of the

6 damages award is to put PEG in the position it would be in had PWB provided it

7 with the access and preconditions necessary to complete its work in a reasonable

8 and timely manner.

9       Moreover, the specific purpose of home office overhead damages is to

10 compensate the injured party for the overhead that accrued during the performance

11 of the contract but were not absorbed by the contract price. The costs absorbed by

12 the contract price are in turn based on the time the party expects to spend

13 performing the contract. *See West v. All State Boiler, Inc.*, 146 F.3d at 1378 ("A

14 contractor who generally can perform multiple contracts … will assign a

15 proportional fraction of its total indirect costs for the contract period *based* both

16 *on the anticipated time of total performance of each particular contract* as well as

17 its other expected revenue streams during that period.") (emphasis added). Where

18 performance on the contract takes longer than the subcontractor reasonably

19 anticipated, "the [sub]contractor will unavoidably have underestimated the

20 appropriate share of indirect costs to attribute to the performance of the contract;

21 that underestimation is due to the … delay during performance, not to any fault of

22 the [sub]contractor's." *Id.* at 1379-80. Accordingly, in estimating the amount of

23 home office overhead costs that were unabsorbed by the MWD Subcontract price,

24 it is appropriate to calculate the delay by reference to the amount of time PEG

25 reasonably anticipated it would spend performing the contract when it calculated

26 its bid.

27       PWB also contends there is no evidence to support the accuracy of the

28 income statements on which the calculations are based. However, as noted above

in discussing PEG's job cost reports, there was evidence offered at trial supporting a determination that the records from which the reports were made are accurate. PWB also argues there is no evidence the items included in the income statements meet the legal requirements for home office overhead. However, the income statements are sufficiently itemized to allow a reasonable jury to determine which expenses qualify as home office overhead and which do not.[27] Accordingly, there was sufficient evidence to support a reasonable calculation of PEG's unabsorbed home office overhead.

### (c)  Extra Work

PWB does not contend there is a complete lack of evidence on PEG's extra work claims but instead challenges the amount awarded on PEG's claims for extra work. PWB's main argument is that the Subcontract specifies the cost for Time & Materials tickets as actual costs plus a fixed markup, and the evidence cannot support an inference that PEG had actual costs within the amount awarded by the jury, even after accounting for the permissible markup. PEG requested amounts for its Time & Materials tickets at a rate of $67.44 per hour, which would only be valid if every hour of labor were performed by someone who's salary was $48 per hour. But it appears to be undisputed that at least some of the hours were performed by workers who were paid significantly less, while none of the workers were paid more. Accordingly, the evidence offered cannot support the amount requested by PEG.

PEG contends the jury may have found the amount to be reasonable. However, the fact that the amounts requested by PEG may be "reasonable" is irrelevant because with respect to the Time & Materials tickets, the contract does not permit PEG to recover any amount deemed to be reasonable. It only permits recovery of actual costs plus a fixed markup of 15%.

---

[27] *See* Exs. 279-83.

PEG also argues the jury may have reduced the amount awarded to be consistent with the evidence, but then awarded a higher amount on one of PEG's other claims. However, there was no evidence offered supporting a higher award on any of PEG's other claims. PWB has identified several instances of particular items that were included in PEG's request for damages that should not have been awarded. Accordingly, a new trial with respect to damages is required.

### 3. Reasonable Value

PWB argues there is no substantial evidence that could support a finding that the parties abandoned the subcontracts. "Abandonment requires a finding that *both* parties intended to disregard the contract." *Amelco Elec. v. City of Thousand Oaks*, 27 Cal. 4th 228, 236 (2002) (alterations omitted) (emphasis in original). There was evidence at trial demonstrating both parties continued to assert various rights under the subcontracts even past the conclusion of the projects.[28] PEG nonetheless argues the evidence supports a finding "that the parties abandoned 'the subcontract change order process.'" However, an implied-in-fact modification of the contract, or mutual waiver of certain rights under the contract by the parties does not constitute an intent to disregard the contracts themselves.

"Abandonment occurs … only where both contracting parties agree that the contract is terminated and of no further force and effect." *Ben-Zvi v. Edmar Co.*, 40 Cal. App. 4th 468, 474 (1995) (internal citations omitted). None of the cases cited by PEG purport to recognize this novel theory of "partial abandonment." Even if California law recognized partial abandonment of contracts, a finding that the parties abandoned the subcontracts' change order process but not the rest of the subcontracts would undermine, rather than support, PEG's claim for reasonable value. To the extent written change orders were no longer a prerequisite to performing extra work under (what remained of) the subcontracts, any extra work

---

[28] *See, e.g.*, T2 46:20-25, 48:20-49:5.

21

performed by PEG on these projects was being performed under the subcontracts themselves, and PEG's sole remedy for payment would lie in contract rather than quantum meruit.

Accordingly, the Court grants PWB's motion for judgment as a matter of law on PEG's reasonable value claim and denies the motion for judgment as a matter of law as to all other claims.

**B.      Motion for a New Trial**

**1.      Clear Weight of the Evidence**

PWB argues a new trial should be granted because the clear weight of the evidence is against the jury's verdict. PWB reasserts the arguments made in its motion for judgment as a matter of law. The Court has addressed arguments raised by PWB in its motion for judgment as a matter of law that would warrant a new trial.  (*See* supra.) PWB's additional challenges set forth in its Motion for a New Trial are discussed below.

**a)      Breach of Contract**

**(1)      Delay Damages**

PWB argues PEG's claim for delay damages is barred because PEG failed to comply with the contract's written notice provisions. The Subcontracts provide:

> Time - The parties agree that time is the essence of this Subcontract and that it shall be the Subcontractor's obligation to begin the work herein contracted for as soon as the project upon which the work is to be done is ready for such work or, in any event, within two (2) calendar days after being notified in writing by the Contractor to do so, to complete all work according to the schedule of the Contractor, and to coordinate this work with that of all other contractors, subcontractor[s], and the Contractor in a manner that will facilitate the efficient completion of the entire project. The Contractor shall have complete control over the sequence in which the various portions o[f] the work shall be done and update the schedule as his judgment may dictate. The Subcontractor will adjust his/her work accordingly. *No extension of time shall be considered unless written notification is given ten (10) calendar days after the Subcontractor becomes aware of a delay. Failure to give such notice shall constitute a waiver of any claim or extension of time due to such delay.* (Emphasis added.)

PEG does not dispute it did not give written notice within 10 calendar days of becoming aware of most of the delays for which damages are sought in this action. Instead, PEG argues (1) a similar provision required written notice before PWB could assert backcharges and the parties waived these requirements by consistently ignoring them, and (2) it is reasonable to conclude the requirements of written notice do not apply when the delay is either caused by PWB or PWB is aware of the delay already. There is sufficient evidence in the record to support a finding the parties mutually waived the written notice requirements by routinely ignoring them.[29]

PWB argues it was deprived of its right to fully and fairly cross-examine PEG's expert witness Puzzullo because they had inadequate notice of changes in his opinion regarding PEG's field office overhead damages. Defendants argue whenever they pointed out that Puzzullo's field office overhead calculation included line items that were not properly part of PEG's field office overhead, Puzzullo would remove those items from his calculation thus lowering his estimated field office overhead. However, the fact that Puzzullo changed his calculations and admitted that his previous calculation was wrong was the subject of cross-examination. PWB has not demonstrated prejudice from Puzzullo's changing his total damages calculation, especially given that the methodology for calculating the amount remained the same. Even if the jury gave Puzzullo's testimony on this point no weight, it is not proper to grant a new trial on this basis because there was other evidence in the record regarding field office overhead damages. Therefore, the jury's verdict regarding delay damages is not against the clear weight of the evidence.

---

[29] *See, e.g.*, T3 108:10-24. The jury could infer the provision was waived from the fact that an "extension" was "considered," i.e., that the schedule was updated to extend PEG's time for performance (implicit in the fact that PEG was not penalized for finishing after the original anticipated completion date).

## (2) Extra Work

PWB argues the lack of written change orders bars PEG's claims for extra work. The Subcontracts contain the following provision:

> Changes – *The Subcontractor shall adhere strictly to the plans and specifications unless a change has been ordered in writing by the Contractor and the cost thereof to the Contractor has been agreed to in writing.* The Subcontractor hereby agrees to make any and all changes, furnish the materials and perform the work that the Contractor may direct, without nullifying this Subcontract, at a reasonable addition to, or reduction from, the price of this Subcontract.… (Emphasis added.)

Defendant contends the italicized language above bars Plaintiff's claims for additional compensation because it never ordered any changes in writing. This issue, however, does not warrant a new trial because there was evidence presented at trial that the parties consistently disregarded this provision on the site and that PEG was directed by PWB to perform the extra work for which it seeks compensation, which is sufficient to support a finding of waiver by conduct, as recognized under California law.

### (a) Specific Extra Work Items

#### (i) Soil Conditions

PWB argues PEG cannot recover extra work damages relating to the soil conditions on Guam because there was a geotechnical report incorporated into the Subcontract that correctly identified the soil conditions and thus dealing with those soil conditions was within the scope of the original contract. However, as PEG points out, the Request for Proposal upon which PEG formulated its bid was also incorporated into the contract, and the Request for Proposal set forth a contrary standard as to the soil conditions. David Porges testified that when conflicts occurred between two different documents, the stricter of the two standards would govern as a matter of industry practice which in this case was the Request for Proposal relied on by PEG. The clear weight of the evidence therefore was not against a finding that work in connection with the soil conditions constituted extra

24

work.

### (ii)     Fire Alarm Redesign

PWB argues PEG's claim for extra work relating to a fire alarm system redesign included items that are not compensable. Specifically, in order to get a particular piece of equipment at a cheaper cost, David Porges attended a training seminar in Nevada and purchased a laptop that was required for the seminar. PWB also contends PEG acquired one of the items for the project at "dealer" price but then requested full price in its Time & Materials invoice, which constitutes a much greater markup than the 15% allowed under the contract. These expenses in connection with the fire alarm redesign appear improper, and PEG does not provide any meaningful explanation in its opposition. Accordingly, a new trial on the issue of damages on this issue is warranted.

### 2.     Purported Inconsistencies in the Verdict

PWB contends portions of the jury's verdict are in conflict with each other, and that judgment therefore cannot be entered thereon, thus requiring a new trial. When faced with claims that a jury's responses to special verdict interrogatories are inconsistent, "a trial court has a duty to harmonize those responses whenever possible." *El-Hakem v. BJY Inc.*, 415 F.3d 1068, 1074 (9th Cir. 2005). In doing so, the Court "must accept any reasonable interpretation of the jury's actions, reconciling the jury's findings 'by exegesis if necessary.'" *Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020, 1038 (9th Cir. 2003) (quoting *Gallic v. Baltimore & O. R.R. Co.*, 372 U.S. 108, 119 (1963)).

Most of PWB's arguments are based on the relationship between the particular amounts requested by the parties and awarded by the jury on the various claims, which are set forth below:

| MWD Breach of Contract | Requested | Awarded |
| --- | --- | --- |
| Unpaid Contract Balance | $2,400.00 | $2,400.00 |

| | | |
|---|---|---|
| Extra Work | $64,968.11 | $64,968.11 |
| Field Office Overhead | $107,997.21 | $107,997.21 |
| Home Office Overhead | $86,768.00 | $86,768.00 |
| **Total** | **$262,133.32** | **$262,133.32** |

| **MWD Miller Act** | **Requested** | **Awarded** |
|---|---|---|
| Unpaid Contract Balance | $2,400.00 | $2,400.00 |
| Extra Work | $64,968.11 | $64,968.11 |
| Field Office Overhead | $107,997.21 | $26,999.30 |
| Home Office Overhead | $86,768.00 | $21,692.00 |
| **Total** | **$262,133.32** | **$116,059.41** |

| **MWD Reasonable Value** | **Requested** | **Awarded** |
|---|---|---|
| **Total** | **$262,133.32** | **$116,059.41** |

| **MWD Set-Off** | **Requested** | **Awarded** |
|---|---|---|
| **Total** | **$31,041.09** | **$31,041.09** |

| **Red Horse Breach of Contract** | **Requested** | **Awarded** |
|---|---|---|
| Unpaid Contract Balance | $149,151.61 | $149,151.61 |
| Extra Work | $61,854.82 | $61,854.82 |
| Field Office Overhead | $93,837.08 | $93,837.08 |
| Home Office Overhead | $114,303.72 | $114,303.72 |
| **Total** | **$419,147.23** | **$419,147.23** |

| **Red Horse Miller Act** | **Requested** | **Awarded** |
|---|---|---|
| Unpaid Contract Balance | $149,151.61 | $149,151.61 |
| Extra Work | $61,854.82 | $61,854.82 |

| | Requested | Awarded |
|---|---|---|
| Field Office Overhead | $93,837.08 | $23,459.27 |
| Home Office Overhead | $114,303.72 | $28,575.93 |
| **Total** | **$419,147.23** | **$263,041.63** |

| **Red Horse Reasonable Value** | **Requested** | **Awarded** |
|---|---|---|
| **Total** | **$419,147.23** | **$263,041.63** |

| **Red Horse Set-Off** | **Requested** | **Awarded** |
|---|---|---|
| **Total** | **$35,536.03** | **$35,536.03** |

a) **Failure of Condition Precedent**

During the course of the Red Horse Project, a dispute arose between PEG and PWB as to certain work that had been performed by another subcontractor, JSW.[30] PWB contended the work done by JSW was within the scope of PEG's subcontract and JSW had performed the work at PEG's direction or PEG had acquiesced in JSW's performing the work.[31] PEG contended the work done by JSW was not within the scope of PEG's subcontract and it had not directed JSW to perform the work.[32] PWB ultimately paid JSW for the work it had performed, but asserted a back-charge against PEG in this action for the cost of JSW's work, asserting the work was within the scope of PEG's subcontract and PEG had breached the subcontract by failing to perform the work itself. This back-charge was seemingly[33] included in the amount PWB requested from the jury, and the jury awarded the amount sought by PWB.[34]

---

[30] *See generally* Ex. 586.

[31] *See id.* at 586.18, 586.20.

[32] *See id.* at 586.16.

[33] Although the jury's award of back-charges was not itemized, PEG does not dispute PWB's contention that there was insufficient evidence to support the jury's ultimate award under any calculation not including the JSW back-charge.

[34] Dkt. No. 241 at 6.

The Red Horse Subcontract provided:

> Contractor agrees to include in his/her monthly work estimate to the owner the value of all work of the Subcontractor incorporated into this project. Subcontractor hereby agrees that estimates submitted to the Contractor shall be for work actually performed upon this project and that all such work, including labor, materials and services, has been paid for. In addition, at Contractor[']s request he/she shall submit a list of all suppliers of materials and services and shall furnace releases on forms provided by the contractor.… *As a condition precedent ... to remittance of Subcontractor's final payment, Subcontractor shall* execute a waiver of Mechanic's Lien provisions … in its own behalf and *obtain executed waivers of the said Mechanic's Lien law ... from all persons supplying materials, services and/or furnishing labor other than the employees of the Subcontractor upon the project.* He/she shall guarantee that all labor and materials used on the project have been fully paid for. (Ex. 358.2 § III (emphasis added).)

Therefore, the issue is whether in finding PEG was liable for the cost of the work performed by JSW, the jury necessarily found that JSW falls within the scope of the italicized language above. Based on the plain language of the clause,[35] it is only those with whom the subcontractor contracted who will be expecting to be paid by the subcontractor, and they are also the only ones that the subcontractor can confidently anticipate obtaining releases from. Therefore, the italicized language above is limited to those with whom PEG has contracted to perform its work. Although there is some evidence that could support an inference that PEG requested that JSW perform work on its behalf, there is also ample evidence to support other conclusions. For example, the fact that JSW sought reimbursement directly from PWB rather than from PEG supports the conclusion that PEG did not contract with JSW to perform work for it.[36] Further, even though the jury appears to have found the work performed by JSW was within the scope of PEG's subcontract, the jury could still conclude PEG believed it was not, which would also support a finding PEG did not contract with JSW to perform that work

---

[35] *See* 18 Guam Code § 87104 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.").

[36] *See* Ex. 586.15.

28

on its behalf. Therefore, the jury's finding that PEG is liable for the cost of the work performed by JSW did not necessarily entail a finding that PEG contracted with JSW to perform the work. Accordingly, there is no inconsistency between the jury's award of back-charges to PWB and the jury's award of unpaid contract balance on the Red Horse Subcontract to PEG.

> ### b) Impossibility of Determining Judgment Amount from the Verdict

PWB also argues internal inconsistencies on the verdict form make it impossible to calculate a single sum owed between the parties without impermissibly rejecting certain factual findings by the jury. Specifically, PWB contends "[t]he reason that the Judgment does not set forth a single, total amount awarded in favor of PEG is because to do so would clearly show that the verdict is fatally inconsistent and that PEG would have to both adopt and ignore certain jury findings to determine a single, total amount awarded, which is improper." However, PWB requested that the amount of its setoff claims be included in the judgment separately.[37] If PWB had not made this request, it would have been possible to reduce the judgment to a single damages award against each defendant, representing the sum of Plaintiff's claims against PWB minus the sum of PWB's setoff counter-claims against PEG and the sum of Plaintiff's claims against Travelers Casualty and Surety Company of America ("Travelers"). Such a judgment awarding PEG $993,804.47 against PWB and $379,101.04 against Travelers, would not conflict with any factual findings actually made by the jury.[38]

---

[37] *See* Dkt. No. 260 at 2 ("Defendants object that Plaintiff's proposed judgment does not address PWB's breach of contract counterclaims, which PWB amended during trial to seek only a setoff against Plaintiff's claims in lieu of any affirmative relief. Plaintiff does not object to including the setoff amounts in the judgment. Accordingly, the Court's judgment will explicitly note PWB's setoff amounts.").

[38] Whether an award of $993,804.47 would be against the clear weight of the evidence is a separate question, discussed below.

29

### a)  Breach of Contract and Abandonment of Contract

PWB argues there is a fundamental inconsistency in the jury's finding that PWB both breached and abandoned the parties' subcontracts. Because the Court grants the motion for judgment as a matter of law on PEG's reasonable value claims, PWB's request for a new trial on PEG's reasonable value claims is moot.

The Court, however, must issue a conditional ruling indicating whether a new trial should be granted "if the judgment" as to PEG's reasonable value claims "is later vacated or reversed." Fed. R. Civ. P. 50(c)(1). "Partial abandonment" of a contract, as urged by PEG, is not a concept recognized under California law governing claims for reasonable value. Moreover, the record contains insufficient evidence to support a finding that the parties abandoned the subcontracts in their entirety. Therefore, if judgment on PEG's claim for reasonable value is vacated or reversed on the basis that California law does recognize PEG's concept of partial contract abandonment, then there is no conflict in finding abandonment and breach since the breach could pertain to a contractual provisions that was not abandoned. Thus, no reconciliation is necessary if a reasonable value claim can be based on partial abandonment.

If, on the other hand, the judgment against PEG on its reasonable value claim is vacated or reversed on the basis that there was sufficient evidence to support a finding that the contracts were entirely abandoned, the Court must attempt to harmonize the jury's factual findings. *El-Hakem*, 415 F.3d at 1074. "In doing so, the court must search for a reasonable way to read the verdicts as expressing a coherent view of the case, and the consistency of the jury verdicts must be considered in light of the judge's instructions to the jury." *Id.* (quotations, alterations omitted). Here, the jury may have found the parties abandoned the subcontracts, but also found the subcontracts were breached *before* they were abandoned. California law permits a party to recover damages for breach of a contract that occurs prior to the parties' abandonment of the contract, while also

recovering the reasonable value of services provided after the contract is abandoned. *See, e.g.*, *C. Norman Peterson Co. v. Container Corp. of America*, 172 Cal. App. 3d 628, 640, 642-44 (1985) ("We agree with respondent that rather than being inconsistent with abandonment, these and other breaches by CCA were actually the precipitating cause for the construction contract being abandoned … and the subsequent implicit understanding by the parties to proceed with the project on a quantum meruit basis."). Assuming the jury found that the parties abandoned the contracts entirely, nothing in the record precludes a finding that this abandonment occurred after any breach of contract found by the jury. Therefore, any apparent inconsistency between the jury's findings of breach and abandonment is not—by itself—a sufficient basis to disregard the jury's verdict and order a new trial. *Gallick v. Baltimore & O. R. Co.*, 372 U.S. 108, 119 (1963).

### b) Duplicative Damages Awards for Breach of Contract and Reasonable Value

Given there is no inherent inconsistency in finding a contract has been both breached and subsequently abandoned as discussed above, the verdict form thus permitted the jury to award damages on PEG's reasonable value claim even if it had already awarded damages for breach of contract.[39] However, the verdict form instructed the jury "not [to] include any amounts that were included in [the breach of contract award]."[40] On PEG's breach of contract claims, the jury awarded the entire amount PEG requested,[41] which PEG conceded in closing argument includes full compensation for all work PEG performed on the MWD and Red Horse Projects.[42] The jury also awarded significant damages on PEG's reasonable

---

[39] Dkt. No. 241 at 4-5, 7-8.

[40] *Id.* at 5, 8.

[41] *Id.* at 2, 5-6.

[42] *See* T10 52:21-55:5 (setting forth "a summary of the money that we are asking for *in this lawsuit*") (emphasis added); Dkt. No. 265-178, Ex. 1012 ("Excerpts of Pl.'s Closing Arg. Demonstrative Slides") at 5-6.

31

value claims.[43] As PWB observes, "[i]n other words, the jury either awarded damages that were not even claimed by PEG, or they disregarded the [Court's] instructions and awarded damages for work that was already compensated in the breach of contract claim." PEG, for its part, while contending there was sufficient evidence to support the jury's finding of liability on its reasonable value claim, does not attempt to defend the damages award itself.[44]

Because the jury's damages award on PEG's breach of contract claims fully compensated PEG for all losses it alleged, it appears the jury's separate award of damages on PEG's reasonable value claim was the result of jury confusion as to the nature of that claim and the damages sought thereunder and returned a duplicative verdict in contravention of the Court's instructions as a result. It appears the instruction given to the jury on "reasonable value," the wording of the verdict form's written questions regarding abandonment, and statements made by PEG's counsel in closing argument likely led the jury to believe that the verdict form questions under PEG's reasonable value claim related to whether the parties abandoned the subcontracts' change-order process—a subsidiary dispute within the scope of PEG's breach of contract claim—not to whether the subcontracts were abandoned entirely as necessary to give rise to a wholly separate basis of liability. The duplicative nature of the damages award further corroborates the inference that the jury believed the abandonment issue to be a subsidiary aspect of PEG's breach of contract claim, rather than an independent basis for liability.

In light of these considerations, the Court finds a miscarriage of justice will result absent a new trial on PEG's claim for reasonable value. Accordingly, the Court conditionally rules that, if judgment in favor of PWB on PEG's reasonable value claims is vacated or reversed on appeal, a new trial should be granted on

---

[43] Dkt. No. 241 at 5, 8.
[44] *See* Opp'n to JMOL Mot. at 22 ("Porges concedes that the reasonable value verdict is duplicative of the breach of contract verdict.").

PEG's reasonable value claim.[45]

### c) Differences between Breach of Contract Damages and Miller Act Damages

PWB also argues there is an inconsistency between the verdict on PEG's Miller Act claims and the verdict on PEG's breach of contract claims because a different amount was awarded under each. However, the jury was instructed regarding damages for PEG's breach of contract under California law and separately instructed on damages under the Miller Act. The jury, in applying the standards set out in these separate instructions, reached two separate results. Nothing in the Court's instructions required the jury to render the same verdict under the Miller Act as under the breach of contract claim.

PWB nonetheless argues it is inconsistent as a matter of law for the verdict on PEG's Miller Act claim to be different from that on its breach of contract claim because Ninth Circuit case law looks to the underlying contract as the measure of damages under the Miller Act. However, the "amount due" under the subcontracts for purposes of the Miller Act is conceptually distinct from the amount necessary to compensate PEG for any injury proximately caused by PWB's breaches of the subcontracts, and the fact that the amounts may be different does not establish that they are inconsistent. Moreover, to the extent there is an inconsistency, it is a legal inconsistency, not a factual inconsistency. Here, the jury was never instructed that its verdict needed to conform to the legal rule that PWB now asserts, and having failed to request an instruction on such a legal rule, PWB cannot now complain that the legal rule was disregarded.

### 2. Implied Juror Bias

PWB also seeks a new trial on all claims on the ground the verdict in this

---

[45] While the likelihood of juror confusion regarding the verdict form's questions relating to reasonable value warrants a new trial on PEG's reasonable value claim, it does not warrant upsetting the jury's verdict on other claims.

33

case was the result of implied juror bias on the part of Juror No. 1 (referred to as Juror No. 20 during voir dire).

<blockquote>

a)      **Juror No. 1's relationship with Judge Elyze McDonald Iriarte**

</blockquote>

PWB argues "Elyze McDonald Iriarte was lead counsel on this case; she issued the summons and complaint, acted as lead counsel for a time, and remained lead local until her appointment to the Guam Superior Court bench. [Juror No. 1] is Ms. Iriarte's first cousin and saw Ms. Iriarte as recently as a few weeks before trial…." However, Juror No. 1's answers to the Court's questions on voir dire demonstrate he was unaware of any of the facts that PWB contends give rise to a presumption of bias. The relevant portions of the juror's voir dire are set forth below.

| | |
|---|---|
| THE COURT: | Do you know lawyers and judges? |
| JUROR NO. 20: | Yes, Your Honor. |
| THE COURT: | And what would be your association with them? Lawyers maybe representing you, or the agency for which you worked? Judges maybe presiding over proceedings that came before the court? Other than that, your knowledge of lawyers or judges? |
| JUROR NO. 20: | So, Joe McDonald—Joseph McDonald is my uncle. He works for the local AG's office. Charles McDonald, he's also a cousin—first cousin of mine. He's over—he's over in Saipan. |
| … | |
| JUROR NO. 20: | Elyze McDonald Iriarte, Judge, E.J. Torres, a friend of mine. Zach Damian a friend of mine. |
| … | |
| THE COURT: | All right. Thank you, sir. You may be seated. Follow-up questions by Plaintiff's counsel? |
| MR. BLUM: | No, Your Honor. |
| THE COURT: | Defense? |
| MR. SANCHEZ: | Yes, Your Honor. May we—may you inquire of the perspective juror, if the cousin, Elyze McDonald |

34

|   |   |   |
|---|---|---|
| 1 | | used to work in the Plaintiff Camacho's law firm before becoming a judge? |
| 2 | THE COURT: | So, sir, if you know that, you can answer that question. |
| 3 | | |
| 4 | JUROR NO. 20: | I have no knowledge. |
| 5 | THE COURT: | All right. Any further follow-up? |
| 6 | MR. SANCHEZ: | Well, I—our information is that— |
| 7 | THE COURT: | Well, sir. |
| 8 | MR. SANCHEZ: | Okay. |
| 9 | THE COURT: | Wait. We don't— |
| 10 | MR. SANCHEZ: | No follow-up question. |
| 11 | THE COURT: | Okay. No follow-up questions. All right. Pass for cause by the Plaintiff? |
| 12 | MR. BLUM: | Yes, Your Honor. |
| 13 | THE COURT: | Defense? |
| 14 | MR. SANCHEZ: | Your Honor, we believe there is cause. |
| 15 | THE COURT: | Well, then we have to come to the sidebar. |
| 16 | MR. SANCHEZ: | Okay. |
| 17 | (Sidebar begins at 2:55 p.m.) | |
| 18 | MR. SANCHEZ: | Mr. Dooley told me that Ms. McDonald, Elyze McDonald before becoming a judge, a Superior Court Judge, did work in the Camacho's law firm. And just in fairness, because we—we have the niece of Mr. Dooley has to be excused, a cousin of someone working in a law firm should be excused as well. |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | THE COURT: | Well, he has no knowledge of that, though. |
| 23 | MR. SANCHEZ: | That doesn't—Your Honor, that doesn't matter. He's family. |
| 24 | | |
| 25 | MR. BLUM: | Well— |
| 26 | THE COURT: | I'm not getting that connection. |
| 27 | MR. SANCHEZ: | The fact that he's family— |
| 28 | THE COURT: | In what way? |

35

| | | |
|---|---|---|
| MR. SANCHEZ: | His cousin worked at the Plaintiff's law firm. And a lot of these times, whether it's okay, sitting here as a juror do I remember the connection, or go home and ask his wife, his common law wife, or learn information, it will impact or may impact based on things he learns in the next two weeks about the relationship. And even though he's sitting here now, it's too close of a relationship. We have plenty of jurors. There's no reason to risk it, to have a juror whose cousin worked for the Plaintiff's law firm. |
| THE COURT: | Even though he may not be aware of that? |
| MR. SANCHEZ: | Right. He may—he's not aware of it now, but he may become when he talks to his wife. |
| THE COURT: | Yes, but we instruct jurors not to do exactly what you are suggesting. But is there anything else that you want to put on the record? |
| MR. SANCHEZ: | Just that I think the relationship is too close. And I understand and respect that we instruct jurors not to talk about cases, but that doesn't—but because it's a cousin in a family gathering, it may— |
| … | |
| MR. SANCHEZ: | Even though we instruct jurors not to talk about the cases with others, because it's family and a close relationship, it may come up, even if we instructed. Where he doesn't initiate, it may come up. And I'd like to know, I'd like further information. We know— |
| THE COURT: | Well, I can bring him and ask more questions, but I just— |
| MR. SANCHEZ: | I would like to— |
| THE COURT: | —you to finish your— |
| MR. SANCHEZ: | Okay. |
| THE COURT: | —thoughts. |
| MR. SANCHEZ: | I'd like to know from opposing counsel when they were there. Was that person there while this case was pending. This case—while the project was going on. I think—I think it's too close of a relationship, particularly when we have another 20 jurors. |
| … | |
| THE COURT: | Okay. I would bring the juror up just to make |

36

| | | |
|---|---|---|
| 1 | | further inquiry. Would the Clerk ask Juror number 20 to come to sidebar? Sir, our mic is here. |
| 2 | … | |
| 3 | THE COURT: | So, there is a Judge McDonald. |
| 4 | JUROR NO. 20: | Yeah. |
| 5 | THE COURT: | Who is on the Bench in Saipan, correct? |
| 6 | JUROR NO. 20: | Well, she's here. |
| 7 | THE COURT: | Oh, here in Guam. |
| 8 | JUROR NO. 20: | Correct. |
| 9<br>10<br>11 | THE COURT: | Okay. And so, do you know anything about the nature of her work before being appointed to the Bench? What she did before being appointed to the Bench? |
| 12 | JUROR NO. 20: | (Indiscernible). ** |
| 13 | THE COURT: | Okay. And how well do you know her? |
| 14 | JUROR NO. 20: | Just social gatherings, I'd see her, family functions. |
| 15 | THE COURT: | When did you see her last? During the holidays maybe? |
| 16 | JUROR NO. 20: | During the holidays and a funeral. A funeral. |
| 17 | THE COURT: | And— |
| 18 | JUROR NO. 20: | A couple of weeks ago. |
| 19<br>20 | THE COURT: | So, if you actually saw her during the holidays, do you know if you had any conversation with her at all? |
| 21 | JUROR NO. 20: | No. No, Your Honor. |
| 22<br>23 | THE COURT: | Okay. You know that she was in a law firm [before] being appointed to the Court? |
| 24 | JUROR NO. 20: | That's correct. |
| 25 | THE COURT: | Right? Do you know which law firm she was associated with? |
| 26 | JUROR NO. 20: | No, Your Honor. |
| 27<br>28 | THE COURT: | Did you have any conversations with her before she was appointed to the Bench about the nature of her law practice? |

37

| | |
|---|---|
| JUROR NO. 20: | No, Your Honor. |
| THE COURT: | Do you know any clients that she may have represented? |
| JUROR NO. 20: | No, Your Honor. |
| THE COURT: | Do you know if she had any involvement in the case as it's been described to you— |
| JUROR NO. 20: | No, Your Honor. |
| THE COURT: | —today. And if you were selected as a juror in this case, of course, you would be instructed not to talk to anyone, including family members about this lawsuit. Do you understand that? |
| JUROR NO. 20: | That's correct, Your Honor. |
| THE COURT: | Is that something that you think you could comply with? |
| JUROR NO. 20: | Yes, Your Honor. |
| THE COURT: | Either counsel have any additional follow-up questions? |
| MR. BLUM: | No, Your Honor. |
| MR. SANCHEZ: | No, Your Honor. |
| THE COURT: | Thank you, sir. You can go back to the box. So, I would not excuse the juror for cause. So, is there anything else that you want me to -- that you want to bring to my attention? |
| MR. SANCHEZ: | No. |
| THE COURT: | No. Okay. Thank you. |

(Sidebar ends at 3:02 p.m.)

T1 153:14-162:20.

Nothing in Juror No. 1's responses or demeanor on voir dire gave the Court any reason to doubt the veracity of his representations that he has no knowledge of the nature of Judge Iriarte's former law practice or whether she had any relationship to the case. Because an average person would not be prejudiced by facts of which he or she is unaware, PWB's claim of implied juror bias based on Juror No. 1's relationship to Judge Iriarte is not persuasive. *See United States v.*

38

*Gonzalez*, 214 F.3d 1109, 1112-13 (9th Cir. 2000) (The implied bias standard is "essentially an objective one" and "[t]he issue for implied bias is whether *an average person in the position of the juror in controversy* would be prejudiced.") (emphasis in original).

### b) Juror No. 1's Relationship with Zach Damian

PWB's also argues Juror No. 1 identified PEG assistant trial counsel, Zach Damian, as "a friend of mine" during voir dire.

The relevant portion of the voir dire transcript is set out below:

THE COURT: Do you know lawyers and judges?

JUROR NO. 20: Yes, Your Honor.

THE COURT: And what would be your association with them? Lawyers maybe representing you, or the agency for which you worked? Judges maybe presiding over proceedings that came before the court? Other than that, your knowledge of lawyers or judges?

…

JUROR NO. 20: Elyze McDonald Iriarte, Judge, E.J. Torres, a friend of mine. Zach Damian a friend of mine.

THE COURT: And those—

JUROR NO. 20: And—

THE COURT: And those who are friends, do you see them at social gatherings?

JUROR NO. 20: With like for instance, Zach is an annual event. And sometimes when we do have meetings with our alumni, some occasions I'll meet up with him.

THE COURT: So how frequently would you say? Once a year? More frequently?

JUROR NO. 20: Twice a year, at least.

THE COURT: All right. Thank you, sir.…

T1 153:14-154:18.

Although Mr. Damian had stated his appearance on the record in the morning, the exchange above took place about five hours into jury selection

39

process. Neither party called the Court's attention to this relationship, so no follow-up inquiries were made. The nature of the relationship disclosed by the record is too uncertain to give rise to such a conclusive presumption of bias. *Cf. Tinsley v. Borg*, 895 F.2d 520, 527 (9th Cir. 1990) ("Only in 'extreme' or 'extraordinary' cases should bias be presumed."). Had PWB raised the issue and prompted further inquiry, additional information might have disclosed facts giving rise to a presumption of bias. The record as it presently stands, however, is not sufficient to presume bias on the part of Juror No. 1 as a matter of law.

## V. CONCLUSION

Accordingly, the Court **GRANTS** PWB's motion for judgment as a matter of law on PEG's Reasonable Value claim and conditionally orders a new trial should the judgment be vacated or reversed on appeal, and **DENIES** the motion for judgment as a matter of law as to all other claims.

As discussed above, PWB has identified multiple items of damages requested by PEG from the jury for which the Court has determined PEG is not entitled to recover or has already recovered. PEG argues the jury might not have included those items in its ultimate damages award, but if the jury is presumed not to have relied on those impermissible items of damages, then the ultimate amount awarded by the jury is greater than the remaining evidence would support. Accordingly, the Court must conclude that the jury either (a) awarded damages which PEG was not legally entitled to recover, or (b) awarded damages that were against the clear weight of the evidence.[46] Accordingly, the Court **GRANTS** the motion for a new trial on damages only.

**IT IS SO ORDERED.**

DATED:  April 12, 2021.

_____
Consuelo B. Marshall
United States District Judge

---

[46] *See* Section IV.A.2.b(5) (Field Office Overhead); Section IV.A.2.b(6)(c) (Extra Work); IV.B.1.a(2)(a)(ii) (Fire Alarm Redesign).

40